UNITED STATES of America

v.

**Irving BITZ, also known as Morris Grossman, Sam Feldman, Stanley J. Lehman, Harry Waltzer, William Walsh, John Lawrence, Jr., Angelo Lospinuso, William Fello, Rocco Fello, also known as Barney Fello, Charles Gordon, formerly known as Abraham Goldberg, Michael Spozate and Bi-County News Corp., Defendants.**

United States District Court
S. D. New York.

Nov. 12, 1959.

S. Hazard Gillespie, Jr., U. S. Atty., Southern Dist. of New York, New York City, Harry G. Sklarsky, Herman Gelfand, Donald Ferguson, Gerald R. Dicker, John D. Swartz, Attys., Dept. of Justice, New York City, Waldman & Waldman, New York City, for defendants William Fello, Rocco Fello, and Bi-County News Corp.

Sylvester & Haimoff, New York City, for defendant Charles Gordon, Louis Waldman, Louis Haimoff, Seymour M. Waldman, New York City, of counsel.

Menahem Stim, New York City, for defendant Sam Feldman, Allen S. Stim, New York City, of counsel.

Samuel Duker, New York City, for defendant William Walsh.

O'Donnell & Schwartz, New York City, for defendants Stanley J. Lehman and John Lawrence, Jr., Edith Lowenstein, New York City, of counsel.

DIMOCK, District Judge.

The allegations of Count One of the indictment will first be summarized. Since these motions deal only with the face of the indictment, this opinion will deal only with the facts therein alleged without regard to actuality.

Newspaper and Mail Deliverers' Union of New York and Vicinity, hereinafter "the Union", has labor contracts with the publishers of all of the principal New York City newspapers and all of the principal magazines published throughout the United States covering such of their employees as are engaged in the handling of newspapers and magazines. It is a provision of these contracts that such publishers can use as wholesalers only such distributors as are themselves under labor contractual relations with the Union. Suburban Wholesalers Association, Inc., hereinafter Suburban Wholesalers, is a New York membership corporation consisting of twelve members who are such distributors and in labor contractual relations with the Union. The necessity of keeping in labor contractual relations with the Union in order to retain the position of wholesaler to the publishers gives strikes and threats of strikes a coercive effect.

The twelve members of Suburban Wholesalers are alleged to distribute the newspapers and magazines in specified sub-areas of the so-called Suburban Area outside of New York City which do not overlap but there is no allegation that they are the sole distributors of the newspapers and magazines in those sub-areas.

Prominent in the list of defendants are officers and representatives of the Union. The rest of it is made up of defendant Bi-County News Corp., hereinafter "Bi-County", and officers, employees and stockholders of various other corporations of undescribed purposes.

Defendants Irving Bitz, Charles Gordon and Bi-County are engaged in the wholesale distribution of newspapers and magazines. Bi-County is alleged to have its principal place of business in Westbury, Long Island. The place of business of the two individuals is not stated.

Count One of the indictment charges a combination and conspiracy, in restraint of the continuous and regular flow in interstate commerce of newspapers and magazines from various states to members of Suburban Wholesalers located in New York, New Jersey and Connecticut, in violation of Section 1 of the Act of Congress of July 2, 1890, entitled "An act to protect trade and commerce against unlawful restraints and monopolies" as amended, c. 647, 26 Stat. 209, 15 U.S.C. Section 1, commonly known as the Sherman Act.

The combination and conspiracy is alleged to have consisted in a continuing agreement and concert of action among defendants and co-conspirators. Its substantial terms have been and are:

"a. To restrain the members of Suburban Wholesalers in their wholesale distribution of newspapers and magazines by coercing and compelling said members to pay to the conspirators various sums of money, as a pre-requisite to obtaining labor contracts with the Union to avoid strikes or the continuation of strikes already called by said Union;

"b. To prevent the shipment of newspapers and magazines in interstate commerce to members of Suburban Wholesalers not acceding to the demands of the conspirators; and

"c. To hinder and exclude or attempt to hinder and exclude actual or potential competitors of defendants Irving Bitz, Charles Gordon and Bi-County."

The combination and conspiracy is alleged to have had the following effects, "among others":

"a. All the members of Suburban Wholesalers have been compelled to pay financial tribute as a condition for engaging in the aforesaid trade and commerce;

"b. Newspaper and magazine publishers have been hindered, restrained or prevented from distributing newspapers and magazines in the Suburban Area to their financial loss and detriment;

"c. Retail news dealers in the Suburban Area have been hindered, restrained or prevented from selling newspapers and magazines to their financial loss and detriment;

"d. Competitors of Irving Bitz, Charles Gordon and Bi-County have been deprived of an equal opportunity to obtain labor contracts with the Union and to compete with these defendants in the wholesale distribution of newspapers and magazines; and

"e. Interstate trade and commerce in the wholesale distribution of newspapers and magazines in the Suburban Area has been unreasonably restrained."

The only allegation as to the means by which the combination and conspiracy has been effectuated is as follows:

"During the period covered by the indictment, the said combination and conspiracy has been effectuated by various means and methods including, but not limited to, the use of union influence, duress and threats of strikes or strikes to compel: (a) the payment of $25,000 by the members of Suburban Wholesalers to defendants Angelo Lospinuso, William Walsh and Harry Waltzer on or about January and February 1955, in connection with the negotiation of a labor contract between the Union and Suburban Wholesalers effective February 1, 1955; (b) the payment of $45,000 by Suburban Wholesalers to defendant Irving Bitz and to defendants Sam Feldman, Stanley J. Lehman, John J. Lawrence, Jr. and Harry Waltzer in connection with the negotiation of a labor contract between the Union and Suburban Wholesalers effective February 1, 1957; and (c) other payments by members of Suburban Wholesalers to various Union officials."

Thus the only allegation of a specific act of any defendant is "the use of union influence, duress and threats of strikes to compel the payment of $25,000 by the members of Suburban Wholesalers" to certain defendants in connection with the negotiations of a labor contract between the Union and Suburban Wholesalers effective February 1, 1955, and the payment of $45,000 by Suburban Wholesalers to certain defendants in connection with the negotiation of a labor contract effective February 1, 1957.

Count Two of the indictment charges an unlawful combination and conspiracy to monopolize for defendants Irving Bitz, Charles Gordon and Bi-County the interstate commerce of newspapers and magazines from various states in the United States to the members of Suburban Wholesalers in Nassau and Suffolk Counties in the State of New York, in violation of Section 2 of the Act of Congress of July 2, 1890, entitled "An act to protect trade and commerce against unlawful restraints and monopolies" as amended, c. 647, 26 Stat. 209, 15 U.S.C. Section 2, commonly known as the Sherman Act.

The combination and conspiracy is alleged to have consisted in an agreement and concert of action with the same terms as that alleged in Count One.

The effects of the combination and conspiracy to monopolize are alleged to be the following, "among others":

"a. Publishers of newspapers and magazines have been deprived of an opportunity to use the distributor of their choice in Nassau and Suffolk Counties;

"b. Wholesale distributors that might compete with defendants Irving Bitz, Charles Gordon and Bi-County have been deprived of an opportunity to distribute newspapers and magazines in Nassau and Suffolk Counties;

"c. Competition in the aforesaid interstate trade and commerce in the wholesale distribution of newspapers and magazines in Nassau and Suffolk Counties has been hindered and impeded; and

"d. Defendants Irving Bitz, Charles Gordon and Bi-County have obtained a monopoly in the wholesale distribution

of magazines in Nassau and Suffolk Counties."

It is alleged that the combination and conspiracy to monopolize has been effectuated by the same acts which were alleged in Count One to have effectuated the combination and conspiracy there charged. Count Two adds, however, the following: "In addition, said offense was effectuated by acts of violence and intimidation in 1958 to coerce publishers to deal with defendants Irving Bitz, Charles Gordon and Bi-County and to exclude competitors from obtaining business from such publishers."

Count Three alleges that defendants Lospinuso, Walsh and Waltzer obstructed commerce and the movement of newspapers and magazines in such commerce by extortion, as defined in section 1951 of Title 18 U.S.Code, in that they obtained $25,000 from the officers and agents of Suburban Wholesalers, induced by the wrongful use of fear in that defendants named in Count Three "did threaten the members of Suburban Wholesalers with labor disputes, work-stoppages, and other labor troubles in connection with the trade and commerce aforesaid unless and until the members of Suburban Wholesalers paid the aforesaid defendants the said amount of money."

Count Four alleges that the said three defendants conspired to commit the crime charged in Count Three.

Count Five is similar to Count Three in that it charges that the offense of extortion was commited by defendants Bitz, Feldman, Lehman, Lawrence, Waltzer and Spozate, in obtaining $45,000 from officers and agents of Suburban Wholesalers.

Count Six alleges that the said six defendants conspired to commit the crime charged in Count Five.

In Count One all of the named defendants are made defendants.

In Count Two all of the defendants named in Count One except defendants Walsh and Lospinuso are made defendants.

In Counts Three and Four, defendants Lospinuso, Walsh and Waltzer are made defendants.

In Counts Five and Six defendants Bitz, Feldman, Lehman, Lawrence, Waltzer and Spozate are made defendants.

Defendant Bitz has pleaded guilty to all of the counts in which he was named, Counts One, Two, Five and Six.

All of the other defendants have moved to dismiss Count One. All of them except defendants Walsh and Lospinuso have moved to dismiss Count Two. Defendants Feldman, Lehman and Lawrence have moved to dismiss Counts Five and Six.

The motions to dismiss by defendants first raise the question whether Count One charges a crime. It is said that the count does not allege injury to the public and that the other facts alleged do not constitute a crime in its absence. The Government in answer says that Klor's Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 "reversed a Court of Appeals decision to the effect that 'public injury' is a necessary allegation 'before an antitrust violation' can be found. 9 Cir., 1958, 255 F.2d 214, 217".

The Klor's case did not abolish the rule that there is no violation of the antitrust laws unless there is public injury; it merely pointed out that there is an exception to that rule where a group boycott is involved. Mr. Justice Black, in discussing Standard Oil Co. of New Jersey v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619, said for the court at page 211 of 359 U.S., at page 709 of 79 S.Ct.:

"The Court recognized that there were some agreements whose validity depended on the surrounding circumstances. It emphasized, however, that there were classes of restraints which from their 'nature or character' were unduly restrictive, and hence forbidden by both the common law and the statute. 221 U.S. at pages 58, 65, 31 S.Ct. at page 515. As to these classes of re-

straints, the Court noted, Congress had determined its own criteria of public harm and it was not for the courts to decide whether in an individual case injury had actually occurred. Id., at pages 63–68, 31 S.Ct. at pages 517–518–519."

He went on to hold that group boycotts were "in the forbidden category".[1] In a footnote to this reference to a "forbidden category" he cited Northern Pacific Ry. Co. v. United States, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545. The Court in the Northern Pacific case at that page said:

"However, there are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use. This principle of *per se* unreasonableness not only makes the type of restraints which are proscribed by the Sherman Act more certain to the benefit of everyone concerned, but it also avoids the necessity for an incredibly complicated and prolonged economic investigation into the entire history of the industry involved, as well as related industries, in an effort to determine at large whether a particular restraint has been unreasonable—an inquiry so often wholly fruitless when undertaken. Among the practices which the courts have heretofore deemed to be unlawful in and of themselves are price-fixing, United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 210, 60 S.Ct. 811, 838, 84 L.Ed. 1129; division of markets, United

States v. Addyston Pipe & Steel Co., 6 Cir., 85 F. 271, 46 L.R.A. 122, affirmed 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136; group boycotts, Fashion Originators' Guild of America v. Federal Trade Comm., 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949; and tying arrangements, International Salt Co. v. United States, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20."

I hold, therefore, that it is only in cases of such *per se* violations as price fixing, division of markets, group boycotts and tying arrangements that proof of public injury is unnecessary. Count One lacks any allegation of public injury or of facts from which it can be inferred. Since it does not allege one of the *per se* violations of the Sherman Act the count is insufficient in law.

Count Two cannot be disposed of so easily. Like Count One it alleges no direct public injury. It contains the statement that an effect of the alleged combination and conspiracy to monopolize is that defendants Bitz, Gordon and Bi-County "have obtained a monopoly in the wholesale distribution of magazines in Nassau and Suffolk Counties."

There is high authority for the proposition that monopoly of the relevant market is *per se* unlawful. It will not do to say, as is said here, that a monopoly in the distribution of magazines in Nassau and Suffolk Counties causes no injury to the public since magazines are always sold at fixed prices. Chief Judge Learned Hand in United States v. Aluminum Co. of America, 2 Cir., 148 F.2d 416, at page 427, pointed out that Congress, in passing the antitrust act, was not actuated by economic motives alone, saying:

"It is possible, because of its indirect social or moral effect, to prefer a system of small producers, each

[1]. Professor Milton Handler in commenting on the Supreme Court's reversal of Circuit Judge Barnes' decision in the Klor's case, Recent Antitrust Developments, 14 Record of the Association of the Bar of the City of New York 318, 349, said:

"Thus, the principal error of Judge Barnes was not that he assimilated public injury into the rule of reason, but rather that he applied the standard of reason to a restraint which properly falls in the *per se* category. It does not follow that the Barnes approach will not have vitality outside the *per se* arena."

dependent for his success upon his own skill and character, to one in which the great mass of those engaged must accept the direction of a few. These considerations, which we have suggested only as possible purposes of the Act, we think the decisions prove to have been in fact its purposes."

It is true that Judge Hand went on at page 428 of 148 F.2d to equate monopoly with price fixing because "the only price at which it could sell is the price which it itself fixed". Nevertheless he followed that with the statement that we are not left to deductive reasoning and cited for the general proposition that monopoly is always unlawful: Swift & Co. v. United States, 196 U.S. 375, 396, 25 S.Ct. 276, 49 L.Ed. 518; Standard Oil Co. of New Jersey v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619; Sugar Institute v. United States, 297 U.S. 553, 56 S.Ct. 629, 80 L.Ed. 859; Appalachian Coals, Inc. v. United States, 288 U.S. 344, 374, 53 S.Ct. 471, 77 L.Ed. 825 and Fashion Originators' Guild v. Federal Trade Commission, 312 U.S. 457, 61 S. Ct. 703, 85 L.Ed. 949.

 Defendants rightly say that there is no objection to an agreement between a manufacturer and a dealer for an exclusive distributorship. Mr. Justice Black in the Klor's decision, 359 U.S. at page 212, 79 S.Ct. 705, 709, 3 L.Ed. 2d 741, carefully distinguished the case that he had in hand from such an arrangement when he said, "This is not a case of a single trader refusing to deal with another, nor even of a manufacturer and a dealer agreeing to an exclusive distributorship." See also Denver Union Stock Yard Co. v. Producers Livestock Marketing Ass'n, 356 U.S. 282, 288, 78 S.Ct. 738, 2 L.Ed.2d 771. Thus I must assume that it would be lawful for the publisher of a magazine to allot to a wholesaler an exclusive distributorship in Nassau and Suffolk Counties. It does not follow, however, that it would be lawful for a single wholesaler to accumulate the exclusive distributorships from all

publishers as is here alleged. It may be that the practice of selling magazines at universally fixed prices would prevent such a monopoly from affecting prices but the other evils of monopoly outlined by Judge Hand in the Aluminum case would remain.

Defendants say that the matter has been determined in their favor in this Circuit by authority. They say that just such an arrangement as is here alleged was approved in Interborough News Co. v. Curtis Publishing Co., 2 Cir., 225 F. 2d 289. There the Curtis Publishing Co. and other publishers transferred their distribution in the metropolitan area from Interborough News Co. to a group of thirteen wholesalers The Court of Appeals affirmed a judgment dismissing Interborough News Co.'s complaint that it had been the victim of an illegal boycott. The plaintiff was in no position to urge that distributorships which it had enjoyed alone constituted a monopoly when parceled out among thirteen wholesalers. Even if it had done so, however, the answer would have been the finding, approved by the Court of Appeals at page 293 of 225 F.2d, that "Each new wholesaler was in spirited competition with plaintiff and each other".

Defendants William Fello, Rocco Fello, Bi-County News Corp., Gordon and Feldman move to dismiss Count Two of the indictment as to them on the ground that it fails adequately to inform them of the charges against them in violation of the sixth amendment of the Constitution and Rule 7(c) F.R.Crim.P.

 This objection is without substance. The conspiracy is described in detail. The moving defendants would have no difficulty in pleading the judgment in this case in bar of a second prosecution. All that the count lacks is a description of the manner in which these defendants joined the conspiracy. That is not required of indictments in conspiracy cases. The Government's claim in that respect is to be discovered, if at all, by means of a motion for a bill of particulars.

Defendants Lehman and Lawrence move to dismiss as to them Count Two, among others, on the ground that it does not disclose the manner in which the alleged conspiracy affected interstate commerce. It is hard to see what more could be said than that it was a conspiracy to monopolize the distribution at wholesale of publications which were received by the wholesalers from the publishers in interstate commerce. United States v. Starlite Drive-In, Inc., 7 Cir., 204 F.2d 419, cited by defendants, went off on the distinction between the business of exhibiting motion pictures and the business of distributing motion picture films. Here the alleged monopoly is one that completely controls the flow of magazines to wholesalers in Nassau and Suffolk Counties from states outside of New York. The fact, if it be a fact, that all of defendants' operations are intrastate does not give them immunity. United States v. Women's Sportswear Mfg. Ass'n, 336 U.S. 460, 464, 69 S.Ct. 714, 93 L.Ed. 805.

Defendant Feldman moves to dismiss Counts Five and Six on the ground that they fail to state a crime.

His motion is based largely on the case of United States v. Callanan, D.C.E.D.Mo., 113 F.Supp. 766. There the court dismissed a count of an indictment charging a violation of section 1951 of title 18 U.S.Code, the same section as is here involved. The language used in the Missouri indictment, as stated by the court, deviated from the words of the statute only to name, by reference, a corporation and to state an amount of money. Counts Five and Six of the instant indictment give much more information than did the one in Callanan. Indeed they give much more information than the indictment in United States v. Palmiotti, 2 Cir., 254 F.2d 491, which was upheld as charging a crime under the same section. Defendant Feldman's motion to dismiss Counts Five and Six for failure to state a crime is denied.

Defendant Feldman moves also to dismiss Count Two and Count Six because they are repetitious of each other and should have been included in one single conspiracy count. It is to be noted that Count Two charges a violation of a statute which makes conspiracy to monopolize commerce a crime while Count Six charges a violation of a different statute which makes conspiracy to obstruct commerce by extortion a crime.

There is nothing inconceivable about there being two separate conspiracies even though it appears likely that proof under the allegations of Count Two would be sufficiently broad to justify a verdict of guilty under Count Six. American Tobacco Co. v. United States, 328 U.S. 781, 788, 66 S.Ct. 1125, 90 L.Ed. 1575. We are at present dealing only with the indictment and it must be accepted as true in alleging that there are two conspiracies. Braverman v. United States, 317 U.S. 49, 52, 63 S.Ct. 99, 87 L.Ed. 23; Schultz v. Hudspeth, 10 Cir., 123 F.2d 729, 730.

It is true that the jury might render a verdict of guilty on both counts and an appellate court might be of opinion that only one conspiracy had been proved but the "two counts were permissible to meet the different interpretations which might be placed on the evidence by the jury" and harm could be guarded against by limiting the sentence to the lesser maximum permissible under either statute. United States v. McKnight, 2 Cir., 253 F.2d 817, 819–820. In no event can it be said at this stage of the proceedings that the counts are repetitious.

Defendants Lehman and Lawrence move to dismiss Count Two as improperly combining two or more conspiracies. It will be recalled that it charges a general conspiracy to monopolize and alleges that it was effectuated by the use of union influence to compel payments of $25,000 and $45,000 which are presumably the same as those which defendants are alleged in Count Six to have conspired to obtain. Defendants cite as authority Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557. That was not a case, however, where the indictment was dismiss-

ed because it combined in one count more than one conspiracy. It was a case where a conviction was reversed because a single conspiracy had been alleged and several proved. To quote the opinion in Braverman v. United States, 317 U.S. 49, 54, 63 S.Ct. 99, 102, 87 L.Ed. 23, supra, "The allegation in a single count of a conspiracy to commit several crimes is not duplicitous, for 'The conspiracy is the crime, and that is one, however diverse its objects.'"

Other grounds urged for the dismissal of Counts Two, Five and Six do not warrant discussion. All motions to dismiss those Counts are denied.

Defendants have made, but not argued, various other motions before me which have been held in abeyance pending decision of the motions to dismiss. In accordance with an arrangement made when the motions to dismiss were argued, counsel will please, within fifteen days from the date of the publication of a note of this decision in the New York Law Journal, arrange among themselves and with the court for a time for argument of any undecided motions.